Greg Adler, SBN 234142
Greg Adler P.C.
35111F Newark Blvd., Suite 500
Newark, CA 94560
Phone: (844) 504-6587
Email: greg@adler.law

Attorney for Plaintiffs Christine Johnson,
Diane Foster, and the Putative Class

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| CHRISTINE JOHNSON and DIANE FOSTER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BUMBLE TRADING, LLC; and DOES 1 THROUGH 50, INCLUSIVE, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR:** <br><br> 1. **Violation of Civil Code § 51 - The Unruh Civil Rights Act; and** <br> 2. **Violation of Civil Code § 51.5; and** <br> 3. **Negligence** |

Plaintiffs Christine Johnson and Diane Foster allege the following:

### <u>NATURE AND BASIS OF ACTION</u>

1. Nearly 40 years ago the California Supreme Court, in *Koire v. Metro Car Wash*, 40 Cal.3d 24 (1985), held unanimously that businesses operating in the State of California that treat consumers unequally based on their sex violate the Unruh Civil

1

Rights Act (codified as Civil Code Section 51). *Koire* held, "The scope of the statute clearly is not limited to exclusionary practices. The Legislature's choice of terms evidences concern not only with access to business establishments, but with equal treatment of patrons in all aspects of the business." *Koire* at 29. Furthermore, sex discrimination "may be generally detrimental to both men and women, because it reinforces harmful stereotypes." *Koire* at 34. "Public policy in California strongly supports eradication of discrimination based on sex. The Unruh Act expressly prohibits sex discrimination by business enterprises." *Id*. at 37.

2. *Koire* was approved by the California Supreme Court in another sex discrimination case, *Angelucci v. Century Supper Club*, 41 Cal.4th 160 (2007), wherein the Court held – again, unanimously – that plaintiffs in Unruh Act cases are not required to first confront the discriminating business and affirmatively assert their right to equal treatment in order to have standing to sue. "As we have explained, the Act imposes a duty upon business establishments to refrain from arbitrary discrimination. If businesses are held not to violate the Act or inflict injury unless they are challenged by a patron, their ordinary practice may revert to discrimination, with special exceptions being made for individuals who happen to challenge the practice. Contrary to the purpose of the Act to eradicate discrimination, the Court of Appeal's interpretation leaves business establishments free to *advertise* and provide gender-based discounts and, presumably, to engage in other forms of discrimination that violate the Act, so long as these establishments agree to provide equal treatment to those customers knowledgeable and assertive enough to demand it." *Angelucci* at 169. (Emphasis added.)

3. Furthermore, in the putative class action of *White v. Square, Inc.,* 7 Cal. 5th 1019, 1032-1033 (2019) the California Supreme Court held, "We conclude that a person who visits a business's website with intent to use its services and encounters terms or conditions that exclude the person from full and equal access to its services has standing under the Unruh Civil Rights Act, with no further requirement that the person enter into an agreement or transaction with the business." The court explained its reasoning by

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

referring to *Angelucci*: "Our reasoning in *Angelucci* makes clear that in order to have standing, White did not need to contact Square to ask for an exception to the stated restriction or to verify that the restriction applied to him. (*Angelucci, supra*, 41 Cal.4th at p. 170.) Such a requirement would limit a business's liability only to individuals who inquire and would potentially enable a business to make exceptions to its stated policies in order to avoid suit, even as its stated policies *deter* the lion's share of customers belonging to a protected group." *White* at 1031. (Emphasis added.) Thus, *White* reflected the California Supreme Court's concern that businesses will not only discriminate outright against customers belonging to a protected group, but also deter customers belonging to a protected group through the advertisement of discriminatory policies.

4. Read together, *Koire*, *Angelucci*, and *White* stand for the proposition that stated policies of sex discrimination are harmful to both men and women; standing is conferred on persons who intended to use a business's services but were deterred from doing so because they encountered discriminatory advertisements; and plaintiffs in such cases are not required to request equal treatment or enter into an agreement or transaction with the business.

5. In the present case, Defendant operates a popular online dating app called Bumble. During Bumble's account setup process, users self-identify their gender – male, female, or nonbinary – and then choose the people they desire to match with – male, female, or nonbinary. This means a female user could match with men, other women, or nonbinary persons. Users then complete their Bumble profile by uploading photos of themselves and entering biographical information (e.g. age, height, religion, geographical location, whether they have children, whether they want children, etc.) Users then have the option to narrow the universe of potentially compatible matches using the same criteria, e.g., a female user can select her search criteria to only show potential matches who are male, 5'10" or taller, and within 30 miles of her location. Or she could select her search criteria to only show potential matches who are also women,

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

within 50 miles of her location, who do not have children, have a particular astrology sign, and are who Catholics, for example.

6. Once the account is set up and the user's profile is complete, the user can begin searching for potential matches based on the search criteria she entered. Bumble then displays a "deck" of other members' profiles who match the user's search criteria, and the user scrolls through or "swipes" through this deck of profiles, one by one. Users swipe left if they do not want to match with the other person or swipe right if they would like to match. If the person on which she swiped right also swipes right on her profile, then Bumble alerts both users that they matched. At that point, both parties to the match have indicated an interest in getting to know each other further, and the users can begin communicating directly through the app.

7. Virtually all dating apps allow either user to initiate contact once the users have matched. However, on Bumble, once the users match, Defendant imposes discriminatory, gender- or sex-based, and sexual-orientation-based rules related to which person is required to initiate contact. Specifically, Defendant has created, approved, advertised, marketed, promoted, hosted, employed, managed, participated in, and/or at least aided or incited an ongoing business model, policy, and practice that requires heterosexual female users to initiate contact with a male match (hereinafter, "Defendant's sex- and sexual orientation-based business model.") But Defendant's sex- and sexual orientation-based business model does not require females of other, non-straight sexual orientations (e.g. bisexual women seeking other women, or lesbians) to send the initial message or make the first move to contact other females. In other words, if a female user is heterosexual, Defendant requires her, and only her, to initiate contact with male matches. However, if a female user matches with another woman, Defendant allows either female to initiate contact with the other woman.

8. Defendant's sex- and sexual orientation-based business model also simultaneously prohibits heterosexual male consumers from initiating contact with a female match. But for any male-to-male match, Defendant's sex- and sexual

orientation-based business model allows either man to initiate contact.

9. Many women, including Plaintiffs, are uncomfortable making the first move and would prefer to be approached by a man after expressing her initial interest by matching with him. Many, if not most, heterosexual women who match with men online want to be pursued, not to be the pursuers. This is consistent with everyday realities and modern culture, i.e., whether at a bar or a library or a grocery store, when heterosexual women in the dating market are interested in men, they generally expect and prefer men to approach and make the first move. Thus, Defendant unlawfully and intentionally discriminates against heterosexual women by limiting their freedom to choose whether they make the first move, but provides that very same freedom to non-heterosexual women.

10. In other words, Defendant's sex-and sexual orientation-based business model (1) prohibits males from making the initial contact with a female match, thus forcing the woman in a heterosexual match to be the initial pursuer, even if that is not what she wants; but (2) allows either person in a non-heterosexual (e.g., lesbians, gay men, or nonbinary persons) match to make the initial contact. Contrary to Defendant's stated goal of "shifting old-fashioned power dynamics and encouraging equality,"[1] forcing heterosexual women to make the first move means men are the only ones given the option of being initially pursued in heterosexual matches, which not only disempowers women by destroying their freedom to choose whether they want the men to contact them first, but also shifts more of the overall burden of online dating to women. Simply put, *not* having to be the one who initiates contact with a match is something many, if not most, women want, but Defendant provides this advantage, privilege, or service to everyone *except* heterosexual women, and therefore violates California Civil Code

---

[1] https://bumble.com/en-us/about "When members of the opposite sex match on Bumble, women are required to make the first move, shifting old-fashioned power dynamics and encouraging equality from the start." (Visited April 1, 2024.)

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

1  sections 51 and 51.5.

2  11. The putative class in this case is defined below as including all female consumers

3  who while in California during the defined time period visited Defendant's bumble.com

4  website or app, with the intent to use Defendant's services, and encountered terms or

5  conditions that excluded these consumers from full and equal advantages, privileges, or

6  services based on the consumers' sex or sexual orientation. Defendant's sex- and sexual

7  orientation-based business model perpetuates generalizations and sex stereotypes which

8  actually harm both sexes as explained in *Koire, supra*, at pp. 34-35:

9      Men and women alike suffer from the stereotypes perpetrated by sex-

10      based differential treatment. (See Kanowitz, "*Benign*" *Sex*

11      *Discrimination: Its Troubles and Their Cure (1980) 31 Hastings L.J.*

12      *1379, 1394;* Comment, *Equal Rights Provisions: The Experience Under*

13      *State Constitutions (1977) 65 Cal.L. Rev. 1086, 1106-1107.)* When the

14      law "emphasizes irrelevant differences between men and women[,] [it]

15      cannot help influencing the content and the tone of the social, as well as

16      the legal, relations between the sexes. . . .  As long as organized legal

17      systems, at once the most respected and most feared of social institutions,

18      continue to differentiate sharply, in treatment or in words, between men

19      and women on the basis of irrelevant and artificially created distinctions,

20      the likelihood of men and women coming to regard one another primarily

21      as fellow human beings and only secondarily as representatives of

22      another sex will continue to be remote.  When men and women are

23      prevented from recognizing one another's essential humanity by sexual

24      prejudices, nourished by legal as well as social institutions, society as a

25      whole remains less than it could otherwise become." (Kanowitz, Women

26      and the Law (1969) p. 4.)

27  12. Defendant's sex- and sexual orientation-based business model is based on class-

28  based generalizations and stereotypes about female and male preferences and behavior.

6

Specifically, as a means of attempting to justify the discrimination, Defendant portrays females as perpetual victims needing special emotional and psychological protection (remember, this is all happening online, not in person, so there is no concern for physical safety) from an entire class of people – males – based on inaccurate, stereotypical depictions of men as rude, sexually-forward ogres who are all inherently incapable of initiating contact with women in a polite and respectful manner. Obviously, the vast majority of men do not behave that way. But when females are approached by other females in search of a same-sex relationship, Defendant assumes no such unsavory rude or sexually-forward behavior occurs between females and the concern just disappears. Or when males are approached by other males for a same-sex relationship, males are presumed to have the emotional and psychological fortitude or wherewithal to handle themselves if one man treats the other man the way Bumble stereotypically presumes heterosexual males treat heterosexual females. Put simply, Defendant's sex- and sexual orientation-based business model is based on stereotypes about heterosexual male behavior and heterosexual female sensitivities and, as a consequence, heterosexual females who actually want men to make the first move when they use Bumble's services are denied that option, even though that option is given to non-heterosexual females. "This sort of class-based generalization as a justification for differential treatment is precisely the type of practice prohibited by the Unruh Act." *Koire* at p. 36. Moreover, "[The] Unruh Civil Rights Act prohibits all forms of stereotypical discrimination." Ibid. See also *Albright et al v. Southern Trace Country Club of Shreveport, Inc. et al* (2004) 879 So.2d 121:

> By limiting gender discrimination in places of public accommodation, our constitution and consistent statutory provisions protect our citizenry from "archaic and overbroad assumptions about the relative needs and capacities of the sexes [that] force [] individuals to labor under stereotypical notions that often bear no relationship to their actual abilities." Even statutes designed to compensate for and ameliorate the

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

effects of past discrimination must be carefully tailored to avoid the inherent risk of reinforcing the stereotypes about the "proper place" of women and their need for special protection.

[The defendant's discriminatory] policy is based on an *inaccurate, stereotypical depiction of male behavior*. The policy implies *protectionism of females* and a veiled attempt to justify discrimination… (Emphasis added.)

13. Indeed, Bumble itself admitted recently that its signature feature – requiring women to make the first move – "feels like a burden for a subset of our customers today." (See *Bumble is now rethinking women making the first move on the app: 'It feels like a burden'*, published March 13, 2024, https://nypost.com/2024/03/13/lifestyle/bumble-is-now-rethinking-women-making-the-first-move-on-app/, last visited April 9, 2024.) That is, Defendant actually agrees with Plaintiffs that a substantial number of women do not want to make the first move, and that requiring those women to do so is problematic. In reality, Bumble's "realization" that it needs to revamp its business model has little to do with newfound sensitivity to its current customers' desires – after all, Bumble's business model has been the same for a decade – but rather a dire need to attract new customers after a 46% drop in its stock price over the past year, the elimination of 30% of its workforce, and a restructuring of its management team. (See https://www.reuters.com/technology/bumble-slumps-ceo-signals-need-app-revamp-after-poor-earnings-2024-02-28/#:~:text=The%20dour%20results%20come%20a,being%20the%20lowest%20at%20%2413, published February 28, 2024; last visited April 9, 2024.) But Defendant will never be able to attract such customers if those customers do not want to make the first move.

14. Moreover, since Bumble's inception in 2014, Defendant has espoused rhetoric

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

characterizing men as "aggressors" in the dating sphere and touting Bumble's mission to "end misogyny through empowered connections…" (See, e.g., https://thebeehive.bumble.com/whitneyftob, last visited April 9, 2024.) On that basis, Defendant has claimed over the years that Bumble's women-make-the-first-move feature was necessary to empower women in the dating world.

15. But this purported quest to empower women by forcing them to make the first move on a dating app is, and always was, a lie. One author characterized a criticism of Bumble as follows: "Bumble is a self-proclaimed feminist app which aims to empower women. However, there are many critics out there that believe that this proclamation is superficial. There are some that believe that the app ridicules and simplifies issues surrounding women empowerment, and that **the app is simply branded as such to seem unique and bring in the big bucks**." (See *Feminist Buzz or Buzzkill? Does Bumble really empower women?*, published September 23, 2019; last visited April 9, 2024, https://medium.com/the-public-ear/feminist-buzz-or-buzzkill-e53019d8a89a.) (Emphasis added.)

16. Bumble's recent financial challenges and its public consideration of jettisoning its primary, decade-old selling point illuminate the truth of that criticism. In other words, because its stock price has dropped so much recently, resulting in significant layoffs and restructuring, Bumble is actively engaged in a transparent effort to tap into the market of women who would otherwise never become Bumble customers because, like Plaintiffs, they do not want the "burden" of making the first move. But what happened to the need for women's empowerment? Did all of the purportedly aggressive, misogynistic men suddenly disappear – the men who, according to Defendant, made Bumble's women-go-first feature necessary and valuable? Of course not. There will always be a small percentage of people in any large group who misbehave. That has not changed. The point is that Defendant's claimed rationale – the need to empower women by protecting them from purportedly aggressive, misogynistic men – for its women-make-the-first-move policy has not changed, but Defendant is considering changing the

policy at or about the same time when Defendant's financial situation has changed for the worse. This reveals Defendant's sex- and sexual orientation-based business model was never about empowering women. It was a pretext. Defendant's true motive has always been about exploiting sexual stereotypes for profit – casting *all* men[2] as scary, misogynistic harassers to create the "problem" for which Bumble offered a highly profitable "solution" – plain and simple. But now, when profits have slumped, Defendant is publicly considering abandoning the very feature that Defendant once claimed empowered women – not because Defendant claims such empowerment is no longer needed – but because Defendant's 'burdensome' policy thwarts its ability to attract a new generation of paying heterosexual female customers who want the option to *not* make the first move.

17. Plaintiffs tried other matchmaking apps in the past, including as recently as the first quarter of 2024, and have not had much satisfaction. Plaintiffs, therefore, decided to research other matchmaking apps and found Bumble.

18. In April of 2023, and again in March of 2024, Plaintiff Christine Johnson visited Defendant's bumble.com website with the specific, bona fide intent of using Defendant's matchmaking services when and where she encountered Defendant's sex- and sexual orientation-based business model that included discriminatory and restrictive terms and conditions that required Ms. Johnson to send the initial message and/or make the first move after matching with a male Bumble user. The same was not

---

[2] Defendant's founder and former CEO, Whitney Wolfe Herd, seemed to acknowledge as much in a 2017 interview in which she stated, "We as women, [with] this modern feminism, I'm worried we're alienating the good guys. It's not really living up to true feminism, which is really equality for everyone, right?" and yet hypocritically founded and ran a dating app premised on treating men and women unequally. (See https://www.theguardian.com/small-business-network/2017/jul/07/bumble-founder-whitney-wolfe-tinder-feminism-online-trolling, published July 7, 2017; last visited April 9, 2024.)

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

required of non-heterosexual women or non-heterosexual men, i.e., if Ms. Johnson matched with another woman, or if Ms. Johnson was a man and matched with another man, Ms. Johnson would not have been required to make the first move. Defendant's sex- and sexual orientation-based business model thereby denied Ms. Johnson full and equal accommodations, advantages, facilities, privileges, or services and discriminated against her based on her sex and/or sexual orientation. Upon encountering Defendant's discriminatory terms and conditions associated with Defendant's sex- and sexual orientation-based business model when she visited Defendant's website with the bona fide intent to use its services, Ms. Johnson opted to not use Defendant's matchmaking app or services because of Defendant's discriminatory terms and conditions. Absent Defendant's sex- and sexual orientation-based business model, Ms. Johnson would have become a paying Bumble customer.

19. In March of 2024, Plaintiff Diane Foster visited Defendant's bumble.com website with the specific, bona fide intent of using Defendant's matchmaking services when and where she encountered Defendant's sex- and sexual orientation-based business model that included discriminatory and restrictive terms and conditions that required Ms. Foster to send the initial message and/or make the first move after matching with a male Bumble user. The same was not required of non-heterosexual women or non-heterosexual men, i.e., if Ms. Foster matched with another woman, or if Ms. Foster was a man and matched with another man, Ms. Foster would not have been required to make the first move. Defendant's sex- and sexual orientation-based business model thereby denied Ms. Foster full and equal accommodations, advantages, facilities, privileges, or services and discriminated against her based on her sex and/or sexual orientation. Upon encountering Defendant's discriminatory terms and conditions associated with Defendant's sex- and sexual orientation-based business model when she visited Defendant's website with the bona fide intent to use its services, Ms. Foster opted to not use Defendant's matchmaking app or services because of Defendant's discriminatory terms and conditions. Absent Defendant's sex- and sexual orientation-

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

based business model, Ms. Foster would have become a paying Bumble customer.

20. The Judicial Council of California's jury instructions for violations of Civil Code sections 51 and 51.5, i.e., CACI 3060 and 3061, respectively, reflect the Judicial Council's recognition of the California Supreme Court's ruling in *Koire* that sex-based discrimination is "per se injurious." The Directions For Use for CACI 3060 and 3061 recognize that plaintiffs asking for only the statutory damages provided by Civil Code section 52 for violations of section 51 or 51.5, such as Plaintiffs pray for here, do not have to prove they were harmed or that the Defendant's conduct was a substantial factor in causing the harm, because harm is presumed. Nevertheless, Plaintiffs and other similarly situated heterosexual female consumers have indeed been harmed and damaged by Defendant's sex- and sexual orientation-based business model by being denied equal accommodations, advantages, facilities, privileges, or services based on the consumers' sex and/or sexual orientation.

21. This class action complaint is filed on behalf of all heterosexual female consumers seeking redress for Defendant's discriminatory policies and practices via Defendant's sex- and sexual orientation-based business model, which is arbitrary, invidious, unlawful, and unreasonable and has intentionally denied equal accommodations, advantages, facilities, privileges, or services based on Plaintiffs' and the putative class's sex and/or sexual orientation, which is prohibited by Civil Code sections 51 and 51.5.

## **PARTIES**

22. At all times relevant hereto, Plaintiff Christine Johnson has been a heterosexual female and a resident of Riverside County, California, who in April of 2023 and again in March of 2024, visited the www.bumble.com website with the specific, bona fide intent to use Defendant's matchmaking services when and where she encountered Defendant's sex- and sexual orientation-based business model that included discriminatory and restrictive terms and conditions that required Ms. Johnson to make initial contact with a male match while this same business model simultaneously

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

prohibited male uses from making initial contact with Ms. Johnson. Upon encountering Defendant's discriminatory terms and conditions associated with Defendant's sex- and sexual orientation-based business model when she visited Defendant's website with bona fide intent to use Defendant's services, Ms. Johnson opted to not use Defendant's matchmaking app or services because of Defendant's discriminatory terms and conditions.

23. At all times relevant hereto, Plaintiff Diane Foster has been a heterosexual female and a resident of Riverside County, California, who in March of 2024 visited the www.bumble.com website with the specific, bona fide intent to use Defendant's matchmaking services when and where she encountered Defendant's sex- and sexual orientation-based business model that included discriminatory and restrictive terms and conditions that required Ms. Foster to make initial contact with a male match while this same business model simultaneously prohibited male uses from making initial contact with Ms. Foster. Upon encountering Defendant's discriminatory terms and conditions associated with Defendant's sex- and sexual orientation-based business model when she visited Defendant's website with the bona fide intent to use Defendant's services, Ms. Foster opted to not use Defendant's matchmaking app or services because of Defendant's discriminatory terms and conditions.

24. On information and belief, at all times relevant hereto, Defendant Bumble Trading, LLC ("Bumble") has been a limited liability company formed in Delaware with its headquarters in Austin, Texas, and operating as a business establishment doing business in Riverside County, California.

25. The true names and capacities of Does 1 through 50 are unknown to Plaintiffs. When their true names and capacities are learned, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and on that basis allege, each fictitiously named defendant is responsible in some way for and at least aided the occurrences herein alleged, and those defendants proximately caused Plaintiffs' damages. Each reference in this complaint to "Defendants," "Defendant," or a

specifically named defendant refers to all defendants sued under fictitious names.

26. Unless otherwise alleged, whenever reference is made in this complaint to any act of "defendant," "defendants," or to a specifically named defendant, such allegation shall mean that each defendant acted individually and jointly with the other defendant named in the complaint.

27. Unless otherwise alleged, whenever reference is made in this complaint to any act or omission of any corporate or business defendant, such allegation shall mean that such corporation or other business defendant committed or omitted to act as in this complaint through its officers, members, directors, stockholders, employees, agents, and/or representatives while they were acting within the actual or apparent scope of their authority.

28. At all relevant times alleged herein, each defendant has been each the agent, alter-ego, representative, partner, joint venturer, employee, or assistant of the other defendants and has acted within the course and scope of said agency, alter-ego, representation, partnership, or joint venture with the knowledge, notification, authorization, and consent of each of the other defendants.

## JURISDICTION AND VENUE

29. This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1332(d). This is a putative class action where: (i) the proposed class consists of more than 100 members; (ii) at least one class member has a different citizenship from Defendant; and (iii) the claims of the proposed class exceed $5,000,000 in the aggregate. In addition, the Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. The Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367(a).

30. The Court has personal jurisdiction over the Defendant due to its continuous and

systemic contacts with the State of California. Defendant has sufficient business in California and has sufficient minimum contacts in California to render the exercise of personal jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice.

31. Specifically, personal jurisdiction against Defendant is proper under *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770 (1984) because Defendant engages in substantial business activity in the State of California, as opposed to activities which could be characterized as random, isolated, or fortuitous. Defendant has continuously and deliberately cultivated the California market as alleged herein. For example, Defendant has offered, hosted, and promoted in-person matchmaking events in both Los Angeles and San Francisco during the class period (see https://bumble.com/en-us/the-buzz/irl-singles-events; visited April 1, 2024.) Defendant hosted physical networking spaces for its members in Los Angeles[3] as a means of specifically targeting the Los Angeles

---

[3]  https://www.architecturaldigest.com/story/bumbles-la-hive-promises-a-high-design-concept-and-a-list-guest-speakers-like-gwyneth-paltrow#:~:text=And%20on%20February%201%2C%20the,work%2C%20network%2C%20and%20connect. ("Out of all the Bumble Hive's thus far, the Los Angeles pop-up will most embody Bumble's digital experience in physical form. 'The design of the Hive was inspired by three central elements: the new Bumble headquarters in Austin, the modern Los Angeles design sensibility, and the concept of a buzzing beehive,' explains Kailani Novotny of Manifold Design and Development. 'We combined a hexagonal hive pattern with custom backlit mirrors and floor-to-ceiling shelves to bring depth, reflectivity, motion, and a personalized feel to the space. The hexagon shape also appears in the chandeliers, tiles, rugs, and side tables to carry the Bumble brand throughout.'

This extreme branding, which is also present in the company's Austin headquarters, was very important to Wolfe Herd. 'Bumble is all about community and safe, empowered connections, and the Hive represents a natural extension of our brand and our values,' explains the founder. 'We love that we've given people an opportunity to connect digitally, and the Hive allows us and our users to take that to the next level in a space where connections can come to life in person. Los Angeles is home to millions

market, and during the class period even bought advertising space on physical billboards such as this one in South San Francisco:



32. Personal jurisdiction against Defendant is also proper under *Calder v. Jones*, 465 U.S. 783 (1984) because Defendant aimed its commercial activities at California knowing that the effects of the activities would be felt there by advertising, marketing, and promoting Defendant's sex- and sexual orientation-based business model.

33. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

34. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiffs Christine Johnson and Diane Foster reside in Riverside County, California and a substantial part of the acts, events, or omissions giving rise to Plaintiffs' claims

---

of Bumble users and we're thrilled to have an opportunity to get to know them better following how much fun we had with Hive New York City last year.'"

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

occurred in this district and Defendant has conducted business in this district.

## CLASS ALLEGATIONS

35. Plaintiffs bring this class action on behalf of themselves and all other persons similarly situated, defined as follows:

> All heterosexual females who, while in California, visited Defendant's bumble.com website or apps, including but not limited to Defendant's "About this App" page at software application download stores such as Apple's "App Store" and Google's "Play Store," with the intent of using Defendant's matchmaking software application and services, and encountered the discriminatory and restrictive terms and conditions that required heterosexual females to make initial contact with a male match, which thereby denied these female consumers full and equal accommodations, advantages, privileges, or services, or discriminated against such persons, based on the person's sex and/or sexual orientation causing them to not register, sign up, or otherwise use Defendant's dating services during the period beginning on April 9, 2021 through the date of trial of this matter (the "Class Period) (the "Class").

36. The class excludes counsel representing the class, governmental entities, Defendant, any entity in which Defendant has a controlling interest, any of Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other putative class members.

37. Plaintiffs reserve the right to amend or modify the class descriptions with greater particularity or further division into subclasses or limitation to particular issues.

38. This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23 because it is a well-defined community of interest in the litigation and the class is readily and easily ascertainable.

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

39. The potential members of the class are so numerous that joinder of all members of the class is impractical. Although the precise number of putative class members has not been determined at this time, Plaintiffs are informed and believe that the proposed classes include thousands of members.

40. There are common questions of law and fact that predominate over any questions affecting only individual putative class members.

41. Plaintiffs' claims are typical of the claims of the members of the putative class because both Plaintiffs visited Defendant's Bumble.com website with the bona fide intent to use and subscribe to Bumble's matchmaking services where and when they encountered terms and conditions that (1) required heterosexual females to make initial contact with a male match, but (2) allowed either person in a same-sex match to make initial contact, all of which thereby denied these heterosexual female consumers full and equal accommodations, advantages, privileges, or services based on the person's sex and/or sexual orientation causing them to not register, sign up, or otherwise use Defendant's dating services during Class Period. The injuries of each member of the class were caused directly by Defendant's wrongful conduct. In addition, the factual underpinning of Defendant's discriminatory misconduct is common to all members of the putative class and represents a common thread of discriminatory misconduct resulting in injury to all members of the class. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of putative class members and are based on the same legal theories.

42. The members of the Class are so numerous it would be impracticable to join them all individually in a single action. Upon information and belief, and according to several websites, at any time in 2023, there have been approximately 58 million users of Defendant's matchmaking services worldwide. Therefore, the Class is believed to include tens of thousands to hundreds of thousands of members. If the court determines notice to be necessary or appropriate, members of the Class may be notified of the

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

pendency of this action by mail, email, and/or text, supplemented or substituted by published notice.

43. Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions that affect only the individual members of the Class. These common legal and factual questions include:

    (1)    Whether all persons who, while in California visited Defendant's apps or websites during the Class Period, and who intended to use Defendant's matchmaking services, encountered terms or conditions that denied, based on the persons' sex and/or sexual orientation, the full and equal accommodations, advantages, facilities, privileges, or services based on their sex and/or sexual orientation they were entitled to under Civil Code section 51;

    (2)    Whether all persons who, while in California visited Defendant's apps or websites during the Class Period, and who intended to use Defendant's matchmaking services, encountered terms or conditions that discriminated against them based on their sex in violation of Civil Code section 51.5; and

    (3)    Whether Defendant, via Defendant's sex- and sexual orientation-based business model, were negligent.

44. Plaintiffs' claims are typical of the proposed Class's claims. Like the members of the proposed Class, Defendant treated Plaintiffs unequally based on their sex and sexual orientation in violation of California Civil Code sections 51 and 51.5. Plaintiffs and members of the proposed Class are similarly situated and were similarly treated unequally by the same course of unlawful conduct alleged herein. Because the California Supreme Court in *Koire v. Metro Car Wash,* 40 Cal.3d 24 (1985) found that arbitrary sex discrimination is *per se* injurious, harm and causation are presumed for the

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff and the Class in order to recover the $4,000 statutory damages for each and every offense committed against each and every Class member.

45. Plaintiffs will fairly and adequately protect the interests of the members of the Class. They both are members of the proposed Class and have no interests adverse to the interests of the proposed Class.

46. Defendant treated Plaintiffs and the Class unequally with Defendant's sex- and sexual orientation-based business model, and Defendant's unequal treatment of Plaintiffs and other members of the Class provides Plaintiffs with a stake in this action and the incentive to prosecute it vigorously for the Class.

47. Plaintiffs have retained experienced and competent counsel who (a) are experienced with prosecuting claims for Civil Code sections 51 and 51.5 sex- and sexual orientation-based discrimination, (b) are familiar with and have successfully prosecuted these types of sex discrimination class actions, and (c) intend to pursue this action vigorously.

48. A class action is superior to other available methods for the fair and efficient adjudication of the litigation because individual joinder of all members of the Class is impracticable. The damages suffered by each individual member of the Class are relatively small given the expense and burden of individual prosecution of an individual action. Thus, it would be virtually impossible for the members of the Class to individually redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, such litigation would constitute a highly avoidable inefficiency in the administration of justice by the courts. Further, individualized litigation presents the potential for inconsistent or contradictory judgments.

49. Plus, despite the many California statutes, California Supreme Court opinions, and State of California administrative agency publications and opinions that prohibit businesses operating in California from discriminating against consumers based on their

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

sex or sexual orientation, many consumers still likely do not know that policies and practices such as Defendant's sex-and sexual orientation-based business model violates the above-referenced anti-discrimination statutes and are subject to the remedies provided by Civil Code section 52. A class action will right the wrongs inflicted on those many consumers who were treated unequally by Defendant because of their sex and or sexual orientation and who likely do not even know they have valid discrimination claims against Defendant.

50. Defendant, by having created, approved, advertised, marketed, promoted, hosted, employed, managed, participated in, and/or to least have aided or incited Defendant's sex-and sexual orientation-based business model, have acted or have refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole, and making appropriate class certification.

## **FIRST CAUSE OF ACTION**
### **Violation of The Unruh Civil Rights Act, Civil Code Section 51**

51. Plaintiffs incorporate in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

52. Defendant's sex- and sexual orientation-based business model intentionally denied equal accommodations, advantages, facilities, privileges, or services to Plaintiffs, which is prohibited by the Unruh Civil Rights Act, codified as Civil Code section 51.

53. A substantial motivating reason for Defendant's conduct was the Plaintiffs' sex and sexual orientation.

54. Defendant's conduct harmed and damaged Plaintiffs and members of the Class.

55. Defendant's conduct was a substantial factor in causing harm to Plaintiffs and members of the class.

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

56. Defendant's unequal treatment of the Plaintiffs and members of the Class subjects Defendant to injunctive relief.

**SECOND CAUSE OF ACTION**

**Violation of Civil Code Section 51.5**

57. Plaintiffs incorporate in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

58. Defendant's sex- and sexual orientation-based business model intentionally discriminated against Plaintiffs based on their sex and/or sexual orientation, which is prohibited by Civil Code section 51.5.

59. A substantial motivating reason for Defendant's conduct was the sex of the Plaintiffs and the members of the Class.

60. Defendant's conduct harmed and damaged Plaintiff sand the Class.

61. Defendant's conduct was a substantial factor in causing harm to Plaintiffs and the Class.

62. Defendant's unequal treatment of the Plaintiffs and the Class subjects Defendant to injunctive relief.

**THIRD CAUSE OF ACTION**

**Negligence**

63. Plaintiffs incorporate in this cause of action the allegations contained in each and every preceding paragraph of this Complaint as if they were set out at length herein.

64. Defendant had a duty of care to avoid injury to Plaintiffs and the Class. Specifically, Defendants had a duty of care to avoid treating Plaintiffs and the members of the Class unequally based on their sex and/or sexual orientation.

65. Defendant selected, hired, retained, and contracted with persons and/or entities that harmed Plaintiffs and the Class as described above.

66. Defendant had the authority and duty to supervise, prohibit, control, and/or regulate these persons and/or entities that harmed Plaintiffs and the Class.

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

67. Defendant knew or reasonably should have known that persons or entities that harmed Plaintiffs and the Class would harm Plaintiffs and the Class, especially in light of Defendant having been sued in similar lawsuits in previous years.

68. Defendant breached its duty of care by (1) denying Plaintiffs and the Class their right to equal treatment, and (2) failing to use reasonable care in selecting, hiring, supervising, retaining, or contracting with persons or entities who harmed Plaintiffs and the Class.

69. As a direct and proximate result of Defendant's negligence and negligent hiring, supervision, and retention, Plaintiffs and the Class suffered damages in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1. Certification of the case as a class action on behalf of the proposed Class;

2. Designation of Plaintiffs as representatives of the proposed Class;

3. Designation of Plaintiffs' counsel of record as Class Counsel;

4. A declaratory judgment that the practices complained of herein are unlawful and violate California Civil Code §§ 51, 51.5, and 52;

5. Public injunctive relief in the form of a preliminary and permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies, practices, customs, and usages set forth herein;

6. For statutory damages mandated by and pursuant to California Civil Code section 52 for each and every offense committed by Defendant against Plaintiffs and the Class for violating California Civil Code §§ 51, 51.5, and 52;

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

7. Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law, including as provided by California Civil Code § 52; and

8. For such other and further legal and equitable relief as this Court may deem proper, appropriate, justified, or equitable.

Dated: April 9, 2024                    Respectfully submitted,

                                        /s/ *Greg Adler*
                                        Greg Adler

CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES